UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

JACK KINER, Derivatively on Behalf of      :   Civil Action No.
CONDUENT INCORPORATED,                     :
                                            :   VERIFIED STOCKHOLDER DERIVATIVE
                     Plaintiff,             :   COMPLAINT FOR BREACH OF
                                            :   FIDUCIARY DUTY AND UNJUST
        vs.                                 :   ENRICHMENT
                                            :
BRIAN J. WEBB-WALSH and ASHOK              :
VEMURI,                                     :
                                            :
                     Defendants,            :
                                            :
        - and -                             :
                                            :
CONDUENT INCORPORATED, a New York          :
Corporation,                                :
                                            :
                Nominal Defendant.          :
                                            :   DEMAND FOR JURY TRIAL
_____ x

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Conduent Incorporated ("Conduent" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Conduent's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Conduent to billions of dollars in potential liability for violations of state and federal law.

2.      Conduent was formed when it spun off from Xerox Corporation ("Xerox") in 2017.  One of the Conduent's core business areas was managing automated tolling, such as the widely used E-ZPass® system.  The Company manages 46% of the automated tolling in the United States.

3.      As part of the spin-off, however, Conduent was saddled with inefficient legacy contracts.  Soon after it became an independent company, the Individual Defendants (as defined herein) began touting a "strategic transformation" that would rely on technology to power Conduent's growth into the future.  The first step of this "strategic transformation" actually involved three parts: (i) evaluating third-party contracts; (ii) conducting an inventory of the Company's information technology ("IT") infrastructure; and (iii) consolidating data centers.

4.      During the relevant period detailed below, the Individual Defendants claimed that they had completed the initial phase of the strategic transformation and should soon see the benefits

of their efforts.  For example, defendant Ashok Vemuri ("Vemuri"), the Company's then Chief Executive Officer ("CEO") stated, "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships.  Next, we expect to see benefits from the platform rationalization work completed last year."

5.      In contrast to these rosy statements, Conduent had not addressed its suboptomized vendor relationships and it did not possess a systems inventory of its legacy IT infrastructure.  In fact, a key third party was unable to provide the necessary IT support Conduent needed for its business migration plans.  This, in turn, led to the Company's tolling clients having service issues and network outages.  Because of the outages, Conduent's platform did not process tolls for the cashless tolling systems, causing some of the tolling agencies to fine or withhold revenue from the Company.

6.      The Individual Defendants finally had to admit the Company's problems while reporting Conduent's third quarter financial results.  These financial results were materially impacted by the tolling-client service issues.  During an ensuing analyst earnings call, defendant Vemuri blamed "continued suboptimal performance from an inherited legacy technology vendor" and that vendor's "inability to deliver on service level agreements," as well as disruptions to operations that impacted client delivery caused by the Company's "outdated and historically underinvested legacy IT infrastructure."

7.      In the wake of this disclosure, Conduent's stock plunged $5.60 per share, or over 29%, on November 7, 2018, to close at $13.62 per share, erasing over $1.18 billion in market capitalization.

8.      Further, as a direct result of this unlawful course of conduct, Conduent is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the District of

New Jersey on behalf of investors who purchased Conduent's shares (the "Securities Class Action"). On June 5, 2020, the court in the Securities Class Action denied the defendants' motion to dismiss, finding that the plaintiff adequately alleged material misstatements made by defendants with scienter.

9.      Soon after the court's decision, on July 9, 2020, plaintiff sent a litigation demand (the "Demand") to Conduent spelling out the wrongdoing contained herein and demanding that Conduent's Board of Directors (the "Board") investigate and then bring litigation against those responsible for the harm these wrongdoers caused the Company.

10.     The Board, through its specially created "Demand Review Committee," not only refused to bring the litigation, but refused to even consider the Demand.  Instead, the members of the Demand Review Committee stated that they would wait to consider plaintiff's Demand to see what occurred in the Securities Class Action.  When faced with a demand, a board of directors must take both action and a position.  To simply throw up one's hands and wait is wrongful and amounts to an effective refusal.  Accordingly, plaintiff now brings this action in light of the Board's refusal.

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Conduent is incorporated in New York; (ii) a substantial portion of the transactions and wrongs

complained of herein, including the defendants' participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Conduent, occurred in this District; (iii) the Company has adopted an exclusive forum provision that requires "any action or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer or other employee or shareholder of the Corporation to the Corporation or the Corporation's shareholders" be brought in a state or federal court located in New York County in the state of New York; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.    Plaintiff Jack Kiner was a stockholder of Conduent at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Conduent stockholder.  Plaintiff is a citizen of Colorado.

**Nominal Defendant**

15.    Nominal defendant Conduent is a New York corporation with principal executive offices located at 100 Campus Drive, Suite 200, Florham Park, New Jersey.  Accordingly, Conduent is a citizen of New York and New Jersey.  Conduent is a provider of business process services with expertise in managing operations involving high volume, repeatable and individualized interactions. Conduent operates through four business segments: Commercial Industries, Government Services, Transportation, and Other.  Conduent was formed in December 2016 as a spin-off of Xerox's business services division.  As of December 31, 2019, the Company had approximately 67,000 employees.

**Defendants**

16.     Defendant Brian J. Webb-Walsh ("Webb-Walsh") is Conduent's Chief Financial Officer and Executive Vice President and has been since January 2017.  Defendant Webb-Walsh was also the Chief Financial Officer of Xerox Services from January 2016 to December 2016, and held various other positions of increasing responsibility after joining Xerox in 1997.  Defendant Webb-Walsh is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendant Webb-Walsh knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings.  Conduent paid defendant Webb-Walsh the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $450,000 | $100,000 | $1,161,384 | $210,600 | $39,289 | $1,961,273 |

Defendant Webb-Walsh is a citizen of Georgia.

17.     Defendant Vemuri was Conduent's CEO and a director from January 2017 to August 2019.  Defendant Vemuri was also the CEO of Xerox Business Services, LLC and Executive Vice President of Xerox from July 2016 to December 2016.  Defendant Vemuri is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Vemuri knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings.  Conduent paid defendant Vemuri the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $1,000,000 | $5,239,984 | $780,000 | $46,033 | $7,066,017 |

Defendant Vemuri is a citizen of New Jersey.

18.     The defendants identified in ¶¶16-17 are referred to herein as the "Individual Defendants."

## HISTORY OF THE COMPANY
## AND ITS STRATEGIC TRANSFORMATION PLAN

19.     Conduent was formed in 2017 as a spin-off of Xerox, inheriting a number of legacy businesses from Xerox that were not central to its operations.  On December 31, 2016, Conduent separated from Xerox and began to operate as an independent, publicly traded company.  Conduent's CEO at the time was defendant Vemuri.

20.     Conduent provides business process services, including support for transportation services such as toll collection and parking.  The Company primarily operates in four segments: Commercial Industries, Government Services, Transportation, and Other.  Historically, the Company grouped the Transportation and Government Services segments into a single segment called "Public Sector."  The Transportation segment, in particular, primarily provides support for electronic toll collection, public transit, parking, and photo enforcement.   The Company has identified Transportation as a "core business" segment.  According to Conduent's 2017 Annual Report on Form 10-K filed with the SEC on March 1, 2018, the Public Sector (which included the Transportation segment) generated $2.2 billion, or 36%, of Conduent's total revenues.  In the Company's 2018 Annual Report on Form 10-K filed with the SEC on February 28, 2019, Transportation generated $729 million, or 13.5%, of Conduent's total revenues.  Conduent's tolling business accounted for approximately $300 million, or 41%, of the Transportation segment's revenue.  In 2017 and 2018, Conduent managed approximately 50% of automated tolling systems in the United States.

**Conduent Initiates Its "Strategic Transformation" Plan**

21.     Initially, defendant Vemuri stated that Conduent's goal was to "win business that is highly repeatable, and supported by platform-based offerings."  To achieve its goal, Conduent acknowledged that it had to become a company that significantly relies on technology to service its clients.

22.     In early 2017, the Company began what it called the "strategic transformation" plan to provide more technology-based services to its customers.  The initial phase of the strategic transformation included evaluating the Company's third-party vendor contracts and inventorying its IT infrastructure to consolidate Conduent's data centers.

23.     During a February 22, 2017 earnings conference call with analysts and investors, defendant Vemuri announced the strategic transformation and told investors that as the plan progresses, "Conduent will suddenly look like a very different Company than the one recently separated from Xerox."  Defendant Vemuri explained that the purpose of the strategic transformation was to address an unfocused portfolio, redundant systems, inconsistent processes, and unreliable management information.  Key areas of focus during the first phase of the plan included transitioning to automated, platform-based offerings for clients, contract reformation, IT infrastructure improvements, inventorying the technology portfolio, and conducting a strategic review of the Company.  With respect to the Company's contract reformation process, defendant Vemuri emphasized the importance of reliable performance.  In particular, defendant Vemuri stated:

> Number one, it is also incumbent upon us to ensure that we are delivering to the contract that we have signed.  We are driving a higher degree of automation and better processes, delivering them with appropriate optimal solutions.  Delivering them from the right locations, and ensuring that the quality of the service delivered does not invite penalties.

24.     As part of the strategic transformation, in early 2017, Conduent began consolidating its data centers.  This consolidation involved migrating the Company's data from several of its existing data centers to a few centralized locations.

25.     On May 10, 2017, defendant Vemuri informed investors during Conduent's first quarter of 2017 earnings conference call that the strategic transformation "continues to be on track." He also noted that Conduent was "strengthening our relationships with our core technology partners and revisiting our contract obligations to ensure mutual balance and benefit."  During the same call, defendant Webb-Walsh reiterated that the "transformation initiatives remain on track," adding, the "[c]ontract remediation is progressing" and that investments in IT infrastructure and business intelligence were underway and would continue to ramp through the year.  Defendant Vemuri further made it clear that Conduent had completed the review of the Company following its spin-off from Xerox.  In particular, defendant Vemuri stated:

> So clearly as we stood the Company up and we looked at our portfolio of business, we looked at our contracts, we established a much more tighter discipline in terms of deal qualification and criteria of the kind of businesses that we want to get into.  We began to see the picture of actually what the business really looks like in terms of its sustainability, in terms of growth opportunities.  We have completed our exercise with regards to all business segments.

26.     Defendant Vemuri concluded by stating, "[w]e have better visibility and business intelligence in terms of how our own company operates, how we make decisions, how we price deals, et cetera.  And we are driving towards a culture of one Conduent."

27.     On June 8, 2017, Conduent's Vice President of Investor Relations, Alan Katz ("Katz"), spoke to investors at the Robert W. Baird Global Consumer, Technology & Services Conference about how the Company would utilize its technology-based platforms to grow its business.  Katz also held out the Company's Public Sector business, particularly electronic tolling, as

a model IT and platform-based solution for growing and scaling all of Conduent's business segments.  In particular, Katz stated:

> [W]e're moving from more of a siloed organization where we have technology that we implement in certain clients and not in all clients.  We're moving away from that and we're going to utilize technology across the board.  Again, moving towards platform-based offerings[.]
>
> *       *       *
>
> So if you look at our public sector business, I think this is really a good example of how we've successfully implemented platform-based solutions where we're about to leverage IP, IT and expand across multiple clients and grow the business.  I'll point out a couple of really good examples.  So electronic tolling.  We're in the top 2 electronic tolling platform – – tolling providers in the country.  We operate in multiple countries, actually.  And I'm sure lots of you are familiar with E-ZPass, we run E-ZPass tolling up and down the East Coast.  This is a platform that we're able to just go to multiple clients and we can reuse probably between 80% and 90% of the platform. . . .  So its investing in platforms like that, that will allow us to grow the business and expand to numerous clients.  And again, the goal is to make the business simple, repeatable, scalable and more IP and IT based.

28.     On August 9, 2017, Conduent held its second quarter of 2017 earnings conference call with analysts and investors.  During the call, defendant Vemuri provided an update on the progress of the strategic transformation.  In particular, defendant Vemuri stated:

> I will go into more detail on our strategic transformation progress.  As I have described previously, Conduent inherited a sprawling fragmented and costly operational structure that restrained our execution and competitiveness.  Aligning our cost structure and operational footprint with industry benchmarks is foundational to our turnaround plan.  We are getting our arms around this opportunity, and the results are starting to show.

29.     Defendant Vemuri reminded investors that the "[s]trategic transformation is essential to this first phase of our turnaround plan."

30.     Defendant Webb-Walsh also stated that "[w]e have been investing in our people, platforms and internal systems.  We have hired the talent that we need to lead the organization from both a functional and operational perspective."

31.     In addition, when discussing the Company's business divestitures as part of the contract remediation process, defendant Vemuri admitted that whether Conduent "[has] the appropriate IT and talent and technology" was a consideration when determining if the Company should continue a client relationship.

32.     On November 8, 2017, defendant Vemuri discussed the progress of the Strategic Transformation during Conduent's third quarter of 2017 earnings conference call.  In particular, defendant Vemuri stated:

> During the third quarter, we made major strides in centralizing our technology ecosystem, including standardizing our internal systems, investing in tools and consolidating disparate internal platforms.  Collectively, this work is contributing to a more agile, productive and contemporary work environment.

33.     Defendant Vemuri also explained to investors how the strategic transformation efforts would benefit the Company's core business segments, including Transportation.  In particular, defendant Vemuri stated:

> The process of streamlining our portfolio is enabling higher focus around businesses we consider core to the future of Conduent. . . .  They are segments where we can differentiate on the basis of our technical, domain and process expertise.  And most importantly, they are in line with our vision for how we create value for our clients, managing and operating digital interactions with the people they serve at massive scale where each interaction is personalized, secure, compliant, on-demand and on brand, whether it's a payment, disbursement, question or transaction.

34.     Defendant Vemuri added that the "Public Sector illustrates the characteristics of our core business model where technology platform assets are combined with a variety of business services to support a range of distilled interactions with the constituents of our clients."  He further reiterated that Conduent had the "team, resources and offerings" to be a "best-in-class provider of technology-enabled business service solutions" for its clients.

35.     During a JPMorgan Ultimate Services Investor Conference on November 14, 2017, Conduent's Executive Vice President & President of Public Sector, David Amoriell ("Amoriell")

discussed the Company's shift towards technology-centric platform offerings for its clients. Amoriell highlighted the Company's Public Sector business (including its Transportation segment) as an example of how Conduent was already deploying the technology successfully.  In particular, Amoriell stated:

> [Speaking about] the public sector . . . [w]e have the platforms, the intellectual capital to be competitive there and really the focus there is around our platforms and bundled offerings we're taking to our clients. . . .  It's allowed us to drive good margins in this business, right?  It's a segment that's grown about 5%, give or take a percent point, depending upon whether it's transportation or the state local or federal government marketplace, right.  But it's a business, I think, well positioned to go forward in terms of the technology and the domain expertise we have.

36.     In a May 1, 2018 interview with *strategy + business* magazine, defendant Vemuri stated that, to generate profitable growth, the Company "must have leading technology and software platforms" to help clients manage the interactions with the people they serve, and "[Conduent's] execution and delivery of these services must be exceptional."

### CONDUENT FAILED TO ADDRESS ITS TECHNOLOGY ISSUES AND ISSUES WITH THIRD-PARTY VENDORS, RESULTING IN MASSIVE SYSTEM FAILURES FOR CLIENTS ACROSS THE COUNTRY

37.     At the time of the spin-off, the Individual Defendants knew that Conduent lacked the modern IT resources necessary to support its technology-dependent, platform-based service model. For instance, according to a May 2018 interview reported in *strategy + business* magazine, Vemuri stated that in 2017 there were approximately twenty data center outages, as well as mainframe outages, during Conduent's first sixty days of operation.  Defendant Vemuri noted that he was deeply involved in overseeing Conduent's technology and was surprised that Conduent was operating its business using what he called a "1990s ecosystem" of mainframes and data centers, while "everybody else had moved to off-premise systems, moved into the cloud."  Defendant Vemuri further claimed that during Conduent's first sixty days of operation, but prior to the spin-off

from Xerox, he met with approximately twenty-five of Conduent's top clients and learned that the Company had problems managing its data.

38.     On November 8, 2017, over eleven months into operation as a stand-alone company, Conduent held its third quarter of 2017 earnings conference call with analysts and investors during which defendant Vemuri acknowledged that Conduent was still constrained by its IT infrastructure. In particular, defendant Vemuri stated that "[t]he highly fragmented structure we inherited includ[ed] a disjointed IT infrastructure that has impeded productivity and performance as an organization."

39.     Conduent's issues with providing its all-electronic tolling processing services to its tolling clients continued to harm the Company, yet the Company's fiduciaries failed to address its legacy IT issues.  For instance, Conduent manages the cashless tolling system for the New York State Thruway Authority (the "Thruway Authority").  On May 15, 2018, the Thruway Authority announced that Conduent's system failed to process tolls on several of New York's bridges and roads across the state.  This failure to efficiently process tolls resulted in the state issuing late bills, which included excessive fines for users.  As a result, the Thruway Authority announced an amnesty program to absolve New York drivers of more than 281,000 violations worth more than $1.4 million for tolls of the Mario M. Cuomo Bridge that were caused by processing issues with Conduent's cashless tolling system.  The Thruway Authority confirmed that the Company knew of these issues, stating that it was working with Conduent "to simplify the Tolls by Mail website[.]"  Conduent also knew that its contract with the Thruway Authority contained several provisions that allowed the Thruway Authority to suspend payment to Conduent.  In particular:

- Under Article 8.01(b) of the Thruway Authority's contract, "[w]hen, in the opinion of the [Thruway] Authority, reasonable grounds for uncertainty exist with respect to the Contractor's [i.e. Conduent's] ability to perform the Services or any portion thereof, the Authority may . . . i. treat such failure as a repudiation of the Agreement . . . [and] iii. suspend the Contractor's performance hereunder."

- Additionally, under Article 8.04(b) of the Thruway Authority's contract, in the event of unsatisfactory performance, Conduent "shall reimburse the Authority for any revenue, which the Authority identifies as having been lost due to the fault of the Contractor."

- Furthermore, under Article 3.06, the Thruway Authority may withhold payment otherwise due to Conduent if the Thruway Authority finds that the "[Conduent] will be unable to provide the System or perform other Services fully and satisfactorily[,]" or if "[Conduent] has provided poor or defective [w]ork."

40.     Under the contract, the Thruway Authority also had the power to assess penalties for failure to meet performance standards.  Indeed, one July 17, 2018 article published by WAMC.org quoted New York State Senator David Carlucci stating that the Thruway Authority had fined Conduent approximately $470,000 for nonperformance.  The same article showed an e-mail statement from the Thruway Authority in response, stating "[u]nder the existing contract, Conduent has been – – and will continue to be – – penalized financially each and every time they underperform."

41.     Conduent also held a contract to provide services to New Jersey E-ZPass tolling agencies including the New Jersey Turnpike Authority, South Jersey Transportation Authority, Delaware River Port Authority, Delaware River and Bay Authority, Burlington County Bridge Commission, and Delaware River Joint Toll Bridge Commission (collectively, the "NJ Agencies").  This contract allowed the NJ Agencies to assess financial penalties for nonperformance.  Citing the Company's failures to meet performance indicators, the NJ Agencies demanded payment of $5,313,795.59 from Conduent for failing to meet the requirements of the service contract from October 2017 through April 2018.

42.     On June 4, 2018, the Florida Department of Transportation's (the "Florida DOT") tolling systems, which Conduent supported, were due to go offline for system updates.  Unfortunately, Conduent's system updates caused a month-long system outage.  While the systems were down, the systems could not post tolls to users' accounts.  The extended outage created a

- 13 -

backlog of approximately 170 million transactions and the processing delays resulted in the system mischarging customers late fees. Florida DOT announced on July 16, 2018, that it would be withholding all future payments to Conduent under its $287 million contract until the tolling systems were operational. Florida DOT Secretary Mike Dew stated, "[t]he delays in providing a fully functional SunPass system is completely unacceptable to FDOT and to our customers." Additionally, Florida DOT vowed to hold Conduent accountable, to the fullest extent possible, under the contract. Indeed, an *Orlando Weekly* article published on August 14, 2018, reported that the Florida DOT would be fining the Company $800,000 in damages for the issues caused to the tolling system during the June 2018 system upgrade.

43.     On July 11, 2018, New York State Comptroller Thomas P. DiNapoli ("DiNapoli") issued a press release stating that since cashless tolling expanded to all nine crossings managed by Conduent for the Triborough Bridge and Tunnel Authority ("TBTA"), the number of unbilled tolls increased dramatically. Specifically, DiNapoli stated that:

> In the first eight months of 2017, there were nearly 200,000 unbilled tolls, up from 47,240 in 2016. In monetary terms, in 2016 when the Henry Hudson Bridge was the only [TBTA crossing] using cashless tolls, unbilled transactions totaled $259,820. By August 20, 2017, when all of [TBTA's] crossings had instituted cashless tolling, that number rose to $1.6 million.

44.     On July 30, 2018, Florida Senator Bill Nelson and Michigan Senator Gary Peters[1] sent a letter to Joseph Simons, Chairman of the Federal Trade Commission, calling on the Commission to investigate Conduent for its "pattern of mismanaging cashless tolling systems."

---

[1]     Conduent's contract with the Michigan Department of Transportation ("Michigan DOT") also contained a provision that allowed Michigan to withhold payment. In particular, section 12.4 of the contract states, "the State may, without waiving any other rights under this Contract, elect to withhold from the payments due to Contractor under this Contract such amounts that are in dispute for Deliverables or services that do not comply with the performance requirements or standards set forth in the Contract."

Senators Nelson and Peters identified reports of issues with cashless tolling systems in several states including Florida, Michigan, California, Texas, New Hampshire, and Maryland.

### INDIVIDUAL DEFENDANTS MAKE IMPROPER STATEMENTS CONCERNING THE COMPANY'S INADEQUATE TECHNOLOGY AND INABILITY TO SERVICE ITS CLIENTS

45.     The Individual Defendants are responsible for a series of improper statements regarding Conduent's operations, financials, financial prospects, and disclosure controls.  Between February 21, 2018 and November 7, 2018, the Individual Defendants made false or misleading statements and failed to disclose that: (i) the Company had failed to address its suboptimized IT-related workforce and legacy third-party vendor relationships; (ii) Conduent was constrained by its suboptimized contract with third-party vendors from realizing the benefits of its strategic transformation; (iii) Conduent lacked a systems inventory of its legacy IT infrastructure necessary to consolidate its data centers; (iv) Conduent's third-party vendors were unable to create the systems inventory necessary to consolidate the Company's data centers; (v) Conduent's tolling clients were experiencing service issues caused by its deficient IT infrastructure and suboptimal performance by third-party vendors; (vi) Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients; (vii) Conduent's underlying IT infrastructure could not support its core businesses; (viii) Conduent's service issues caused by its deficient IT infrastructure and suboptimal performance by third-party vendors were impacting its core businesses; and (ix) as a result, Conduent's financial statements and forecasts were misleading.

46.     On February 21, 2018, the Company issued a press release announcing its fiscal 2018 revenue and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") guidance and confirming that investors should expect an acceleration of growth in the coming year. Specifically, the Company provided a revenue range of $5.625 billion to $5.799 billion and adjusted EBITDA in the range of $707 million to $733 million.

47.     That same day, Conduent held an earnings conference call with analysts and investors to discuss its fourth quarter of 2017 financial results.  During the call, the Individual Defendants represented that Conduent had exited the initial phase of its strategic transformation.  According to defendant Webb-Walsh, Conduent's projected fiscal 2018 growth of between 8% and 12% was due in part to the positive results of the strategic transformation program, and lower revenue projections were the result of changes to accounting standards for revenue recognition.  Defendant Vemuri also represented that Conduent had eliminated suboptimal third-party vendors.  In particular, he stated that "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships.  Next, we expect to see benefits from the platform rationalization work completed last year."

48.     During the call, defendant Vemuri highlighted the Company's progress at building its capabilities as a technology company.  Specifically, defendant Vemuri represented that Conduent now had a map of its IT infrastructure, which would allow it to start investing in upgrades, stating, "[d]uring our first year, we needed to inventory and rationalize our technology portfolio.  Starting 2018, we'll begin our work to modernize our offerings with cutting-edge technology[.]"

49.     On May 9, 2018, Conduent issued a press release announcing its first quarter of 2018 financial results.  In the press release, the Company reduced its full-year 2018 guidance to between $5.44 billion and $5.64 billion and its adjusted EBITDA guidance to between $672 million and $698 million.

50.     During Conduent's earnings conference call held with analysts and investors that same day, defendant Webb-Walsh stated that these reduced guidance figures were caused by the Company's strategic divestiture of businesses deemed noncore that were scheduled to close in the following quarter.  Additionally, defendant Webb-Walsh stated that but for the Company's strategic

- 16 -

divesture "the guidance ranges that we provided during the last earnings call would not have changed."

51.     During the same call, the defendant Webb-Walsh also reported that the Public Sector revenue "was down 5% sequentially as a result of lower volumes from some transportation clients[.]"   However, defendant Webb-Walsh remained positive with respect to Conduent's Transportation business segment, stating that the Company "still expect[s] to show growth in this area of the business in 2018 as a large tolling contract is expected to ramp by the end of [the second quarter]."   Defendant Vemuri provided an update on the strategic transformation, stating "[r]eal estate and IT consolidation remain large contributors to our transformation work and are progressing well."   Still, the Company's fiduciaries failed to disclose Conduent's IT infrastructure issues, third-party vendor performance issues, or client delivery issues as reasons for revising the fiscal 2018 guidance.

52.     On June 8, 2018, at Conduent's Analyst Day, the Company again reduced its full year 2018 revenue guidance to between $5.4 billion and $5.6 billion and its adjusted EBITDA guidance to between $662 million and $688 million.   Defendant Webb-Walsh again informed investors that the changes to Conduent's guidance resulted from a strategic divesture, and that Conduent "still expect[s] to grow organically in [the fourth quarter] of this year."   Yet again, the Company's fiduciaries failed to disclose Conduent's IT infrastructure issues, third-party vendor performance issues, or client delivery issues as reasons for revising the fiscal 2018 guidance.

53.     During his presentation, defendant Vemuri discussed Conduent's progress on updating its IT infrastructure, stating:

> We're also aggressively attacking our IT infrastructure with a goal of consolidating down to 2 primary data centers and a single network backbone by 2020.  We've taken back our critical network infrastructure as well as our client-facing applications

from service providers to whom we had outsourced for better control and performance by ourselves.

54.     Still, the presentation failed to disclose that Conduent was experiencing problems with the data center migration or that its third-party vendor had proven incapable of recreating the legacy systems inventory that was critical to migrating the data to new data centers.

55.     On August 8, 2018, Conduent issued a press release announcing its second quarter of 2018 financial results.  In the press release, the Company affirmed its fiscal 2018 revenue and adjusted EBITDA guidance from its Analyst Day on June 8, 2018.  During the ensuing earnings conference call held that same day, defendant Vemuri acknowledged that Conduent was experiencing performance issues on a tolling contract for a government client.  Defendant Vemuri provided minimal details regarding the source of the problem, but reassured investors that Conduent had "the capability to efficiently resolve these issues" and that the Company was "dedicating all necessary resources to meet our contractual commitments."  In particular, defendant Vemuri stated:

> Before turning to the highlights of our second quarter, I want to address a matter that has been in the press recently around our performance on a tolling contract with a state government agency.  Confidentiality agreements prevent us from going into specifics.  However, I will note that issues tend to arise in the implementation phase of the startup and ramp of a new tolling system, particularly one that involves transitioning multiple legacy systems to a new and updated integrated state-wide system.  ***We have the capability to efficiently resolve these issues, and are dedicating all necessary resources to meet our contractual commitments.***  We are an industry leader in the automated tolling space across the United States with a strong performance track record, and are confident in our ability to address this issue, and are making good progress toward our mutually agreed-upon timelines.

56.     During the same call, when asked about the impact of any issues concerning the tolling contract on Conduent's financials, defendant Webb-Walsh stated, "we don't anticipate it having an impact on our ability to meet our guidance."  In particular, the following exchange took place:

> [Analyst]: . . . And then as far as the public tolling contract, does the increased resources to complete the work imply somewhat pressured margins there versus

expectations?  Just trying to understand the implications here on the financials from both.

[Defendant Webb-Walsh]: . . . In terms of the tolling contract, we typically don't comment on the financials around one specific contract.  We're obviously working to remediate the situation.  But what I will say is we just confirmed our guidance in revenue, free cash flow and adjusted EBITDA.  So at this time, we don't anticipate it having an impact on our ability to meet our guidance.

### THE TRUTH EMERGES

57.    The truth about the Company's underlying issues with its tolling-client services and

their impact on Conduent's financial performance began to emerge on November 7, 2018, when the

Company issued a press release announcing its third quarter of 2018 financial results and revising its

fiscal 2018 earnings and revenue guidance.  In the press release, Conduent reported adjusted net

income of $61 million for the third quarter, falling below analyst expectations.  Conduent also

reported $1.304 billion in revenue, a decrease of 11.9% compared to the same quarter the prior year,

also falling below analyst expectations.  Furthermore, the Company reduced its fiscal 2018 adjusted

EBITDA guidance from a range of $662 million to $688 million to a range of $640 million to $650

million, and cut its revenue guidance from $5.41 billion to $5.61 billion to $5.34 billion to $5.4

billion.  As the press release stated, "[o]ur updated guidance reflects recent technology and

infrastructure performance issues which are being addressed[.]"

58.    That same day, the Company held an earnings conference call with analysts and

investors to discuss the disappointing results and lowered guidance.  During the call, defendant

Vemuri stated that part of the reason for the reduced guidance was due to failures by a legacy third-

party vendor that resulted in penalties to the Company.  In particular, defendant Vemuri stated:

[We have] had continued suboptimal performance from an inherited legacy technology vendor.  The performance issues stem from the vendor's inability to deliver on service level agreements, lack of responsiveness to Conduent's needs, and poorly structured contracts which we inherited.

59.     Defendant Vemuri further disclosed that the vendor's failure "caused significant disruption to our client delivery and operations and resulted in penalties to Conduent."  Defendant Vemuri cited the failures in Conduent's IT infrastructure as an additional reason for the reduced guidance.  In particular, defendant Vemuri stated:

> [O]ur outdated and historically under-invested legacy IT infrastructure has caused major disruptions to our operations and impacted client delivery performance.  We are investing in our IT infrastructure to ensure our IT performance is in line with our clients' expectations.

60.     Defendant Vemuri further disclosed that the vendor's failure "caused significant disruption to our client delivery and operations and resulted in penalties to Conduent."

61.     During the question and answer portion of the call, defendant Vemuri admitted that Conduent was locked into a relationship with a legacy third-party vendor to provide infrastructure support and he was aware that the vendor had been unable to meet its obligations.  Defendant Vemuri also reiterated that the Company was long aware that it was constrained by the limitations of its existing infrastructure and suboptimized vendor relationship.   In particular, the following exchanges took place:

> [Analyst]: I guess like the operational issues that you mentioned, it seems like a lot of them stemmed from the infrastructure subcontractors that you used. So my question there is, how much of the charge or penalties that you expect to incur in 4Q can be passed on to that subcontractor?  And as you reassess in sourcing of some of that work, how fast can you address some of those issues?  It seems like the core for 2019, core revenue for 2018 has been rebased lower.  So do you expect that these issues to continue into next year as well?
>
> [Defendant Vemuri]: . . . Number one is that we did inherit a very challenged infrastructure, both from a network perspective, the quality of the assets *and unfortunately, a contract that necessitated us to continue to work with the service provider that we had engaged with prior to the formation of Conduent.*  We have addressed, just like we address the client-facing application issue with another large service provider that [we] work was outsourced to prior to the formation of Conduent last year.  Similarly, we have addressed this issue for the last 6 to 7 months.  *As we have progressed from more labor-intensive work to digital technology work, the impact of the nonperformance of this has become severely amplified, resulting in*

*penalties,* as Brian mentioned, as well as detriment of revenue.  That's one of the reasons that we gave for the changing in guidance.

*       *       *

[Analyst]: Ashok, you've been there now for quite a bit of time, and you successively did a lot of divestitures.  But I guess the surprising thing of laying out 5 different issues now, I think, is catching investors in the stock off guard today of the reaction. ***Things like outdated infrastructure and such shouldn't be a surprise today.  And now they're really kind of coming out.  So what did you uncover?  Or is this just a new look under the covers or a new chapter?  Or how should we think about why now as opposed to 12, 14, 15, 18 months ago?***

[Defendant Vemuri]: . . . From an infrastructure and network perspective, the work was started last year.  It takes time for it to sort of unravel or for the results to, good or bad, to become -- to be revealed.  ***And since we were constrained by the service provider that we used, we were doubly challenged.  And this sort of blew up in our face, if you will, or got amplified as we moved more and more of our capabilities and our business from labor base to more technology based.  And the amplification became extremely apparent in our results, as you have seen in this particular quarter.***

This is not a new issue.  We've been addressing this for a while.  The impact of this has suddenly accelerated and got amplified.  We've been working on it.  This has spurred us to make the changes much more quickly.  Those changes have already been made.  We've hired talent within the company.  We've hired external experts and vendors and professionals who can help us in this journey.  Because trust me, we understand the impact of this on, not only our financials, but the impact it has on our clients' performance and our ability to deliver the services to them.

62.     On this news, Conduent's market capitalization dropped more than 29%, or $5.60 per share, on November 7, 2018, to close at $13.62 per share compared to the previous trading day's closing of $19.22 per share, erasing $1.18 billion in market capitalization.

63.     In addition, as a result of the Company's fiduciaries' improper statements detailed herein, the Company is now the subject of the Securities Class Action, on behalf of investors who purchased Conduent shares at artificially inflated prices.  The Securities Class Action seeks claims against Conduent and defendants Vemuri and Webb-Walsh in connection with the Company's improper statements detailed herein, including causes of action under sections 10(b) and 20(a) of the Exchange Act.

64.     On June 5, 2020, U.S. District Judge Susan D. Wigenton of the District of New Jersey denied the defendants' motion to dismiss in its entirety, finding that the plaintiffs sufficiently alleged Conduent's fiduciaries made misrepresentations and omissions in connection with the Company's technology issues, issues that made a material impact on Conduent's financial position.  The Company will now be forced to bear the cost of investigating, defending, and potentially settling (or paying an adverse judgment for) the Securities Class Action.

## DAMAGES TO CONDUENT

65.     As a result of the Individual Defendants' improprieties, Conduent disseminated improper, public statements.  These improper statements have devastated Conduent's credibility as reflected by the Company's $1.18 billion, or 29%, market capitalization loss.

66.     Conduent has expended and will continue to expend significant sums of money as a direct and proximate result of the misconduct described herein.  Such expenditures include, but are not limited to, the costs expended to correct its inadequate internal controls over financial reporting, the costs incurred investigating and defending Conduent and the Individual Defendants in the class action lawsuit for violations of securities laws, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment, and costs incurred from compensation and benefits wrongly paid to individuals who breached their fiduciary duties to the Company.

67.     Further, the Board's inability to implement and maintain adequate internal controls over its IT systems and over its financial reporting and the Company's failure to timely disclose material information exposes Conduent to significant reputational damage within both the business community and the capital markets.  In addition to price and product quality, Conduent's current and potential customers consider a company's ability to curb known abuses and implement adequate controls to ensure improper practices are timely discovered and properly addressed.  Customers are less likely to do business with companies that knowingly permit or encourage unscrupulous

behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information.  Conduent's ability to attract customers and investors is now impaired.  For those customers that the Company does already have, it has incurred fines and lost revenue as a result of the service outages.  In addition, the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Conduent stands to incur higher marginal costs of capital and debt due to the increases of the perceived risks of investing in and lending money to the Company.

### DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

68.     Plaintiff brings this action derivatively in the right and for the benefit of Conduent to redress injuries suffered, and to be suffered, by Conduent as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Conduent is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

69.     Plaintiff will adequately and fairly represent the interests of Conduent in enforcing and prosecuting its rights.

70.     Plaintiff was a stockholder of Conduent at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Conduent stockholder.

71.     On July 9, 2020, plaintiff sent Conduent the Demand detailing the wrongdoing explained herein and demanding that the Board investigate and the initiate litigation against the culpable fiduciaries.  A true and correct copy of the Demand is attached hereto as Exhibit A.

72.     Plaintiff received a short response letter from Conduent's in-house counsel on July 15, 2020.  Counsel confirmed receipt of the Demand.  Counsel also requested that plaintiff provide proof that he was a "qualified to make the Demand."  A true and correct copy of the July 15, 2020 letter is attached hereto as Exhibit B.

73.     Plaintiff responded on July 21, 2020.  Though there is no requirement that plaintiff provide the requested proof, he provided an enclosure with his letter proving that he was a continuous and long-term Conduent stockholder.  In the letter, plaintiff noted that it was improper for internal employees to act as gatekeepers for what information reached the Board.  Plaintiff also inquired as to what steps, if any, the Board was taking in response to the Demand.  A true and correct copy of the July 21, 2020 letter is attached hereto as Exhibit C.

74.     On October 19, 2020, plaintiff was informed that a Demand Review Committee of the Board was formed via a letter from its counsel.  In the perfunctory letter, consisting of a little over a page, counsel for the Demand Review Committee informed plaintiff that it would not undertake the investigation demanded by plaintiff.  The Demand Review Committee claimed that the "critical factor" was the pending Securities Class Action.  It further stated that the earliest the Demand Review Committee would revisit its decision was March 1, 2021, based on whether there were further developments or resolution of the Securities Class Action.  A true and correct copy of the October 19, 2020 letter is attached hereto as Exhibit D.

75.     In response to a demand, a board of directors has an affirmative duty to consider the demand's merits and weigh the costs of taking such an action.  It cannot simply point to a pending lawsuit as a justification for inaction.  *See, e.g.*, *Witchko v. Schorsch*, No. 15 Civ. 6043 (AKH), 2016 WL 3887289, at \*4-\*6 (S.D.N.Y. June 9, 2016).  Accordingly, the Demand Review Committee's refusal to consider plaintiff's Demand in a timely and appropriate manner is a wrongful refusal of the Demand.

76.     Plaintiff has not made any demand on the other stockholders of Conduent to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Conduent is a publicly held company with over 209 million shares outstanding and thousands of stockholders as of October 31, 2020;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants
### for Breach of Fiduciary Duty

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     The Individual Defendants owed and owe Conduent fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Conduent the highest obligation of care and loyalty.

79.     The Individual Defendants and each of them, violated and breached their fiduciary duties.

80.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Conduent has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

81.     Plaintiff, on behalf of Conduent, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants
### for Unjust Enrichment

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Conduent.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Conduent.

84.     Plaintiff, as a stockholder and representative of Conduent, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

85.     Plaintiff, on behalf of Conduent, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Conduent, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B.     Directing Conduent to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Conduent and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

  (a)     a proposal to strengthen the Company's controls over IT systems;

  (b)     a proposal to strengthen the Company's controls over financial reporting;

(c)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

(d)     a provision to permit the stockholders of Conduent to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Conduent has an effective remedy;

D.     Awarding to Conduent restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 28, 2020          ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                     MARK S. REICH

                                              */s/ Mark S. Reich*
                                       MARK S. REICH
                                    58 South Service Road, Suite 200
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)
                                    mreich@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
5040 Shoreham Place
San Diego, CA 92122
Telephone: 619/525-3990
619/525-3991 (fax)
brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

*Attorneys for Plaintiff*